**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **STEPHEN ADLER**, *et al.*, |
| Plaintiffs, |
| v. |
| **GARY LOYD**, *et al.*, |
| Defendants. |

Case No. 1:20-cv-00048 (TNM)

**MEMORANDUM OPINION**

The Trojan horse from Greek mythology is a popular symbol of subterfuge. The wooden horse provided a false sense of security to the city of Troy, while masking the threat of the Greek soldiers hidden within. Plaintiffs Stephen Adler and his company Charity Brands, Inc. (collectively, "Plaintiffs") allege they were victims of a Trojan horse scheme. Plaintiffs claim that Defendants pretended to be legitimate business partners as a ruse to steal their business and clients. As alleged, however, the Court cannot consider this tale. Plaintiffs have not established personal jurisdiction over some Defendants. And for those that remain, Plaintiffs have not stated a federal claim to maintain jurisdiction in this Court. For the following reasons, the Court will grant Defendants' motions to dismiss and dismiss the Amended Complaint.

**I.**

Stephen Adler, through his company Charity Brands, Inc., serves as a liaison between charities and corporate partners. First Am. Compl. ("Am. Compl.") ¶¶ 13–14, ECF No. 20. He connects charities looking to raise funds with businesses interested in those opportunities. *Id.* ¶ 21. Adler cultivates relationships and develops key contacts at these charities and businesses, and he learns how they operate. *Id.* ¶¶ 16, 18. Through his work, he creates "highly confidential

business and strategic plans and proposals," as well as research and "supporting assets such as domain names." *Id.* ¶ 19.  Adler maintains his business information "in a confidential manner" using password-protected, third-party accounts such as GoDaddy, Salesforce, Winmo, and LinkedIn. *Id.* ¶ 20.

In 2018, Defendant Carson Ingle joined Charity Brands and formed another entity with Adler, the Adler Ingle Corporation. *Id.* ¶ 23.  Soon after, Defendant Gary Loyd approached Adler about purchasing one or both these companies. *See id.* ¶ 27.  But he eventually shifted his attention to acquiring Defendant Big Circle, LLC, a different company Ingle founded with Adler and another individual. *See id.* ¶¶ 28, 30.

Mr. Loyd planned to invest in Big Circle through Defendant Intellix Solutions, LLC ("Intellix"), a company he wholly owned and controlled, using money held in a trust by trustee Tanya Loyd, his wife. *See id.* ¶¶ 32–33.  Although the parties engaged in discussions about a potential investment, they never reached an agreement. *See id.* ¶ 35.  Plaintiffs claim this investment proposal was a ploy to allow Mr. Loyd and Ingle an opportunity to raid the Charity Brands business. *Id.* ¶ 36.

Plaintiffs allege that Ingle coordinated with Mr. Loyd to change the passwords on Adler's Charity Brands and Big Circle email accounts and their accounts for Salesforce, Winmo, GoDaddy, and LinkedIn. *See id.* ¶¶ 38, 40.  Ingle and Mr. Loyd then used the information in these accounts to secure business opportunities for themselves and Big Circle, not Adler or Charity Brands. *See id.* ¶¶ 42, 48.  They contacted and met with Charity Brands partners in the summer and fall of 2019 and falsely claimed credit for Charity Brands' materials and prior work. *See id.* ¶¶ 42–49, 60.  They also told some partners that Adler retired, was sick, or passed the business on to them. *Id.* ¶¶ 54, 56.  Plaintiffs also allege that Ingle and Mr. Loyd replaced

Charity Brands with Big Circle on contracts and invoices without Adler's permission. *See id.*
¶¶ 52–53. They claim these efforts to exploit Charity Brands and their work are ongoing. *See id.*
¶¶ 70–71.

Plaintiffs bring this action against Ms. Loyd, Mr. Loyd, Ingle, Big Circle, and Intellix
(collectively, "Defendants").[1] They sue all Defendants for violating the federal RICO statute, 18
U.S.C. § 1962, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. Am. Compl.
¶¶ 72–96, 137–43. Plaintiffs also raise state law claims against various Defendants. *Id.* ¶¶ 97–
136.

Ms. Loyd moved to dismiss, as did Ingle and Big Circle together, and Mr. Loyd and
Intellix together. Ms. Loyd, Ingle, and Big Circle move to dismiss for lack of personal
jurisdiction under Rule 12(b)(2). And all Defendants move to dismiss for failure to state a claim
under Rule 12(b)(6).[2]

## II.

A complaint survives a motion to dismiss under Rule 12(b)(2) if the plaintiff establishes
"a factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y.*
*Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). The plaintiff "must allege specific acts
connecting the defendant with the forum." *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375,
1378 (D.C. Cir. 1988) (cleaned up). In assessing personal jurisdiction, courts can "receive and
weigh affidavits and any other relevant matter to assist [them] in determining the jurisdictional
facts." *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 98 (D.D.C. 2008)

---

[1] This action is stayed as to Defendant Big Circle Holdings, LLC because of its bankruptcy
proceedings. *See* Min. Order (May 14, 2020).

[2] The parties requested an oral hearing on Defendants' motions to dismiss. The Court finds that
these motions can be resolved without one. *See* LCvR 7(f).

(cleaned up).  Any factual discrepancies are resolved in the plaintiff's favor.  *Crane*, 894 F.2d at 456.

To avoid dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up).  In construing a motion to dismiss, courts "draw all reasonable inferences from those allegations in the plaintiff's favor," but will not "assume the truth of legal conclusions." *Id.*  It is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III.

### A.

Ms. Loyd, Ingle, and Big Circle move to dismiss for lack of personal jurisdiction under Rule 12(b)(2).[3]  Personal jurisdiction can either be general or specific.  General personal jurisdiction exists when a defendant's connections with the forum are "so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up).  For corporations, the "paradigm all-purpose forums" are their principal place of business and state of incorporation. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); D.C. Code § 13-422.

---

[3]  Mr. Loyd and Intellix did not challenge personal jurisdiction so they waive the argument. *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016).

When general jurisdiction is unavailable, a court might still exercise specific personal jurisdiction over a defendant. Specific personal jurisdiction is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations*, 564 U.S. at 919 (cleaned up). As with general personal jurisdiction, a plaintiff must show specific personal jurisdiction is proper under the forum's long-arm statute and due process. *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094–95 (D.C. Cir. 2008).

The District of Columbia's long-arm statute enumerates the circumstances under which courts in the District can exercise specific personal jurisdiction. *See* D.C. Code § 13-423. These circumstances include if the defendant transacts business or causes tortious injury here. *See id*. § 13-423(a)(1), (3). Under the due process clause, specific personal jurisdiction exists if the plaintiff shows "minimum contacts between the defendant and the forum establishing that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (cleaned up).

### 1.

Ms. Loyd argues that the Amended Complaint contains no facts that connect her to the District. *See* Def. Tanya Loyd's Mot. to Dismiss at 16–19, ECF No. 25.[4] The Court agrees. Ms. Loyd is a bystander in the Amended Complaint. Indeed, there is only one specific allegation against her. "Upon information and belief," Mr. Loyd "intended" to use money from her trust to invest in Big Circle. *See* Am. Compl. ¶ 32. Even if true, this single allegation does not establish personal jurisdiction in the District. There is no suggestion that Ms. Loyd knew her trust money

---

[4] All page citations refer to the page numbers that the CM/ECF system generates.

would be used to invest in Big Circle or that Big Circle was based here.  Nor did Mr. Loyd ever use the trust money to invest in Big Circle.  *See id.* ¶ 35.

Plaintiffs seek to salvage personal jurisdiction for Ms. Loyd through a conspiracy theory. *See* Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss ("Pls.' Opp'n") at 16, ECF No. 28.  They claim the Amended Complaint "establishes the overall narrative" of Ms. Loyd as a member of the conspiracy to overtake his business.  *Id.*  Not so.  As Plaintiffs admit, personal jurisdiction based on a conspiracy still requires "specific acts connecting the defendant with the forum." *Id.* (quoting *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)).  Those specific acts are missing here.  After removing the claim that Ms. Loyd was the "funder," what remains are conclusory allegations that reference Ms. Loyd only in passing.  *See, e.g.*, *id.* ¶ 75 ("Gary Loyd conspired with his wife, Tanya Loyd, to defraud Mr. Adler and Charity Brands by means of false or fraudulent pretenses, representations, and promises to obtain a controlling equity interest in Charity Brands' business.").  These bare allegations fail to establish specific personal jurisdiction.  *See First Chi. Int'l*, 836 F.2d at 1378–79.

General personal jurisdiction also is unavailable.  Ms. Loyd does not reside in the District.  Am. Compl. ¶ 5; Decl. of Tanya Loyd ¶ 4, ECF No. 25-1 at 42–43.  And she has never owned property or transacted business here.  Decl. of Tanya Loyd ¶¶ 7–8.

The Court lacks personal jurisdiction over Ms. Loyd and will grant her motion to dismiss.

## 2.

Ingle is in a different posture than Ms. Loyd, but the result is the same.  Plaintiffs portray Ingle as the "inside-man" directly involved in the scheme to steal the Charity Brands business. Am. Compl. ¶ 1.  Still, Plaintiffs allege no nexus between Ingle and this forum.

General personal jurisdiction is not an option.  Ingle lives in California and has never lived in the District.  Am. Compl. ¶ 6; Decl. of Carson Ingle ¶ 2, ECF No. 27-1.  And there is no allegation that he owns property here.

Nor is there specific personal jurisdiction.  While Ingle appears central to the allegations in the Amended Complaint, Plaintiffs "allege[] no contacts with the District."  *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) (cleaned up).  Missing from the Amended Complaint is any event involving Ingle in the District "deriving from, or connected with" Plaintiffs' claims.  *Goodyear Dunlop Tires Operations*, 564 U.S. at 919 (cleaned up).

Plaintiffs do not disagree.  They instead seek to manufacture personal jurisdiction over Ingle in their opposition brief.  There, they claim for the first time that Ingle "conducted business on a routine basis" in the District, and they state that Ingle "met with multiple clients and potential clients" here.  Pls.' Opp'n at 15.  None of these statements, however, appears in the Amended Complaint or is supported by evidence.  So they cannot serve as a basis to establish personal jurisdiction.  *See Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994).[5]

To be clear, facts may exist connecting Ingle with this forum.  But Plaintiffs have not pleaded them in the Amended Complaint.  Thus, the Court will grant Ingle's motion to dismiss for lack of personal jurisdiction.

**3.**

Plaintiffs have established personal jurisdiction over Big Circle.  They allege that Big Circle's principal place of business is the District.  *See* Am. Compl. ¶ 8.  And they provide a

---

[5]  Big Circle's actions also do not establish personal jurisdiction over Ingle because "[e]ach defendant's contacts with the forum State must be assessed individually."  *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984).

screenshot of a Big Circle website, "www.bigcircle.co," listing a D.C. office address.  *See id*.  ¶ 29.

Big Circle disputes these allegations.  Relying on a declaration from Ingle, it claims that it "neither is or ever has been domiciled in the District" and it "has never maintained an office in the District."  Mot. by Defs. Carson Ingle and Big Circle, LLC to Dismiss Am. Compl. ("Ingle/Big Circle Mot.") at 18, ECF No. 27.  Perhaps.  But this is a factual discrepancy that favors Plaintiffs at this stage.  *Crane*, 894 F.2d at 456.

Big Circle also claims that Plaintiffs fail to identify which of the "Big Circle" entities— Big Circle, LLC or Big Circle Holdings, LLC—published the website with the office address in the District.  *See* Corrected Reply in Supp. of Mot. to Dismiss by Defs. Carson Ingle and Big Circle, LLC at 5, ECF No. 32.  That is true enough.  But the Court draws all reasonable inferences in favor of Plaintiffs on a motion to dismiss.  *Banneker Ventures*, 798 F.3d at 1129. And it is reasonable to infer that the website "www.bigcircle.co" belongs to Big Circle given all the allegations present here.

Plaintiffs' allegations are enough to establish general personal jurisdiction over Big Circle.  *See* D.C. Code § 13-422; *Daimler*, 571 U.S. at 137.

**B.**

Mr. Loyd, Intellix, and Big Circle still remain as Defendants.  All three have moved to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6).  The Court first considers their motions as to Plaintiffs' two federal claims, which establish the Court's subject matter jurisdiction.  *See* Am. Compl. ¶ 10.  In short, neither federal claim survives.[6]

---

[6] Even if Plaintiffs had established personal jurisdiction over Ms. Loyd and Ingle, both federal claims would still be dismissed against Ms. Loyd and Ingle for the same reasons discussed below.

**1.**

Plaintiffs first allege a violation of the federal RICO statute, 18 U.S.C. § 1962(c).  *See id.*

¶¶ 72–96.  Congress enacted RICO to "seek the eradication of organized crime in the United

States."  *United States v. Turkette*, 452 U.S. 576, 589 (1981) (cleaned up).  But its reach is not

limited to "mobsters and organized criminals."  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

499 (1985).  It extends to "respected businesses allegedly engaged in a pattern of specifically

identified criminal conduct."  *Id.*

RICO requires a plaintiff to establish "(1) the conduct (2) of an enterprise (3) through a

pattern of racketeering activity."  *Salinas v. United States*, 522 U.S. 52, 62 (1997).  A "pattern of

racketeering activity" is defined as "at least two acts" that violate state and federal laws

enumerated in the RICO statute.  *See* 18 U.S.C. § 1961(1), (5).

Plaintiffs rely on mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, to

establish a "pattern of racketeering activity."  *See* Pls.' Opp'n at 6–9.  They claim Defendants

committed this fraud when they misrepresented their intentions to invest in the Charity Brands

business and made false and misleading statements to Charity Brands' partners.  *Id.*  But these

predicates raise the bar for Plaintiffs.  A RICO claim based on mail and wire fraud receives

careful scrutiny "because of the relative ease with which a plaintiff may mold a RICO pattern

from allegations that, upon closer scrutiny, do not support it."  *See W. Assocs. Ltd. P'ship, ex rel.*

*Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 637 (D.C. Cir. 2001) (cleaned

up).  And Plaintiffs must plead the fraud with particularity under Rule 9(b).  *See Brink v. Cont'l*

*Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015).

Mr. Loyd, Intellix, and Big Circle raise two challenges to the RICO claim.  First, they

argue Plaintiffs' allegations do not establish a RICO "pattern."  Second, they claim Plaintiffs

9

have not stated mail or wire fraud with particularity. *See* Mot. of Defs. Gary Loyd and Intellix Solutions, LLC to Dismiss the First Am. Compl. ("Loyd/Intellix Mot.") at 18–21, ECF No. 26; Ingle/Big Circle Mot. at 13–14. The Court need only address the first question. Even if Plaintiffs have cleared the Rule 9(b) hurdle, they have not pled a "pattern of racketeering activity."

RICO's "pattern" element prevents "ordinary business disputes from becoming viable RICO claims." *W. Assocs. Ltd. P'ship*, 235 F.3d at 637. That is because the predicate acts must be both related and continuous. *H.J. Inc. v. N.w. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). To prove continuity, it must be "shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Id.* at 240 (emphasis in original). "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241 (cleaned up). Plaintiffs allege neither.

Open-ended continuity requires that the "*threat* of continuity is demonstrated." *Id.* at 242 (emphasis in original). It is "far more than a hypothetical possibility of further predicate acts." *Pyramid Sec. Ltd. v. IB Resol., Inc.*, 924 F.2d 1114, 1119 (D.C. Cir. 1991).

Plaintiffs allege that Defendants "continue to pursue business opportunities and take advantage of Mr. Adler and Charity Brands' trade secrets," and "intend and threaten to continue the business relationships and contracts." Am. Compl. ¶¶ 70–71. These conclusory allegations fall short. At best, they suggest only a "hypothetical possibility of further predicate acts." *Pyramid Sec. Ltd.*, 924 F.2d at 1119. The Amended Complaint contains "nothing suggesting any reason to expect that these defendants, together or separately, will engage in RICO-violating

conduct" in the future.[7]  *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995).

The allegations are better read as an effort to establish close-ended continuity.  The D.C. Circuit identified six factors to assess close-ended continuity:  the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity.  *Id.* at 1265.  This is not a "rigid test."  *W. Assocs. Ltd. P'ship*, 235 F.3d at 634.  It is a "flexible guide" to analyze RICO claims case-by-case.  *Id.*  Indeed, "some factors will weigh so strongly in one direction as to be dispositive."  *Id.* (cleaned up).

Following *H.J.* and its progeny, two principles on close-ended continuity come to the fore.  "Predicate acts extending over a few weeks or months" with no threat of continuing cannot establish a pattern.  *H.J.*, 492 U.S. at 242.  And it is "virtually impossible for plaintiffs to state a RICO claim" where there is "only a single scheme, a single injury, and few victims."  *W. Assocs. Ltd. P'ship*, 235 F.3d at 634 (cleaned up).

Plaintiffs' purported pattern fails both principles.  Throughout the Amended Complaint, they allege a single scheme by Defendants to steal the Charity Brands business through fraud and misappropriation.  *See, e.g.*, Am. Compl. ¶¶ 1, 38, 65 n.2, 75–76, 96.  This single scheme involved twelve predicate acts:  the fraudulent proposal to invest in the Charity Brands business and eleven other instances of fraud identified by Plaintiffs, some of which involved Charity Brands' partners.  Pls.' Opp'n at 7–9.  These acts constitute a single scheme, not multiple schemes, because they were "similar in nature and purpose."  *W. Assocs. Ltd. P'ship*, 235 F.3d at

---

[7]  In opposition, Plaintiffs argue that Defendants' scheme is ongoing based on a social media post from Ingle.  Pls.' Opp'n at 4–5.  This allegation is not in the Amended Complaint or supported by evidence so it is not appropriate to consider it here.  *See Henthorn*, 29 F.3d at 688.

635.  All twelve acts were committed in furtherance of the scheme to take Adler's business away from him.  *See, e.g.*, Am. Compl. ¶¶ 42, 48.

And most predicate acts in this scheme took place over a four-month period in the summer of 2019.  *See* Pls.' Opp'n at 8–9; Am. Compl. ¶¶ 43–45, 47, 50, 56–57.  Plaintiffs suggest the scheme started as early as fall 2018 and continued through the filing of the original complaint in January 2020.  *See* Pls.' Opp'n at 4; Am. Compl. ¶ 96.  Perhaps.  But that does not salvage the claim.

Consider the allegations in *Edmondson & Gallagher*.  48 F.3d at 1260.  There, the plaintiff alleged that a group of tenants sought to either prevent or delay a building sale, or secure a ransom to allow the sale to proceed, by falsely claiming they had properly exercised their right of first refusal to the building.  *Id.* at 1263–64.  By the time title was resolved for the plaintiff, "market conditions had changed substantially" and made the contract "unperformable."  *Id.* at 1264 (cleaned up).  The D.C. Circuit affirmed dismissal of the RICO claim.  *Id.* at 1265.  It concluded that the fifteen alleged predicate acts committed over three years—with most occurring in a short time frame—could not establish a RICO pattern.  *Id.*; *see also W. Assocs. Ltd. P'ship*, 235 F.3d. at 635–37 (affirming dismissal of RICO claim where plaintiffs alleged "dozens of predicate acts extending continually over an eight-year period").

So too here.  Even accepting Plaintiffs' suggested time frame, the alleged conduct took place over a two-year period.  And it involved twelve predicate acts.  At best then, they have alleged fewer acts committed over less time than the D.C. Circuit has already found inadequate to state a RICO pattern.

The Amended Complaint also suggests there were only two victims:  Adler and his company, Charity Brands.  After all, the goal was to defraud Adler and take away his business

12

without compensation.  *See, e.g.*, Am. Compl. ¶¶ 1, 38, 43, 45, 63, 75, 78, 95.  Plaintiffs do identify seven Charity Brands corporate and charity partners that purportedly received false representations and documents from Defendants.  *See* Pls.' Opp'n at 8–9.  It is unclear, however, whether Plaintiffs seek to claim these Charity Brands partners as direct, rather than indirect, victims of the scheme.

In *Western Associates Limited Partnership*, the court rejected the plaintiff's efforts to transform its allegations into a multi-victim RICO pattern.  235 F.3d. at 635.  The plaintiff had alleged fraud committed against a limited partnership and claimed that each individual partner was a separate victim under the scheme.  *Id.*  The D.C. Circuit disagreed and affirmed dismissal of the RICO claim.  It found that any injury to the partners was indirect because if the partnership was injured "then naturally those who have a financial interest in [the partnership] may be affected."  *Id.* (cleaned up).  And this indirect injury "does not make them individual victims under RICO."  *Id.*

The Court doubts that Charity Brands' corporate and charity partners meet *Western Associates*' test.  But even if they were direct victims, nine victims (the seven Charity Brands partners, Adler, and Charity Brands) "alone cannot establish a pattern of racketeering activity." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 82 (D.D.C. 2019) ("*Ambellu II*"), *aff'd*, 2020 WL 873574 (D.C. Cir. Feb. 14, 2020).  The "single discrete" goal to overtake Adler's Charity Brands business is "far more important."  *Edmondson & Gallagher*, 48 F.3d at 1265.

In sum, Plaintiffs have alleged a single scheme of twelve predicate acts over a few months—two years at the most—that "threaten[s] no future criminal conduct."  *H.J.*, 492 U.S. at

242.  These factors "weigh so strongly in one direction as to be dispositive." *Edmondson &*
*Gallagher*, 48 F.3d at 1265.

Without a "pattern of racketeering activity," this is an ordinary business dispute outside
the reach of the RICO statute.  This count will be dismissed for failure to state a claim.

**2.**

Plaintiffs' remaining federal claim is misappropriation of trade secrets in violation of the
DTSA, 18 U.S.C. § 1836.  *See* Am. Compl. ¶¶ 137–43.  Enacted in 2016, the DTSA creates a
private right of action for the "owner of a trade secret that is misappropriated."  *See id.*
§ 1836(b)(1).  It defines "trade secret" broadly to include "all forms and types of financial,
business, scientific, economic, or engineering information."  *Id.* § 1839(3).  For the information
to qualify as a "trade secret," the owner must take "reasonable measures to keep such
information secret," and the information must "derive[] independent economic value . . . from
not being generally known to, and not being readily ascertainable through proper means."  *Id.*
§ 1839(3)(A)–(B).  The D.C. Circuit has yet to interpret the DTSA or its local counterpart, D.C.
Code § 36-401.  So the Court turns to other appellate decisions interpreting the DTSA and
comparable state statutes to guide its analysis.

Big Circle, Mr. Loyd, and Intellix contend that Plaintiffs failed to allege "reasonable
measures" to establish a trade secret under the DTSA.  In support of their argument, they note
that Plaintiffs had no nondisclosure or confidentiality agreement protecting their business
information.  *See* Ingle/Big Circle Mot. at 16–17; Loyd/Intellix Mot. at 22–23.  It is true that
these agreements may satisfy the reasonable measures requirement under a trade secret statute.
*See, e.g.*, *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding
reasonable measures under the Uniform Trade Secret Act where company "required its

employees to sign confidentiality agreements respecting its trade secrets"). But they are not required. A reasonable measure depends on the circumstances, not any bright-line rule. *See Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1112 (10th Cir. 2009). Thus, the lack of a confidentiality or nondisclosure agreement does not necessarily doom Plaintiffs' misappropriation claim.

Still, *some* safeguards must be implemented. Plaintiffs allege that Adler maintained the information "in a confidential manner" in password-protected, third-party accounts including GoDaddy, LinkedIn, Salesforce, and Winmo. Am. Compl. ¶ 20. The Court is skeptical that passwords through third-party accounts—which often require a password to set up the account— are enough to satisfy the reasonable measures requirement. But this is a factual question not determinative at this stage. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003). Accepted as true, Plaintiffs' allegations could show reasonable measures to protect their business information as to third parties.

The issue, however, is that Adler admits he shared the business information with "close business partners or employees." Am. Compl. ¶ 140. This appears to include Ingle, a member of both Charity Brands and Big Circle. *See id.* ¶¶ 23, 28. Plaintiffs do not allege that Ingle hacked into or otherwise illegally accessed the accounts, only that Ingle "changed the password" and "took control." *See id.* ¶¶ 38, 40. And Mr. Loyd accessed the information through Ingle. *See id.*

To be sure, Adler could share business information with employees and close business associates and still claim the information as a trade secret. *See A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991) ("The mere fact that an employee has access to information the employer regards as confidential is not inconsistent with treatment of the information as a trade secret."). But he must show that those with access have an obligation to ensure the secrecy of the information. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual

15

discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."); *A.F.A. Tours, Inc.*, 937 F.2d at 89 ("The employer must . . . take appropriate precautions to alert the employee to the need to maintain the confidentiality.").  Otherwise, the information loses its value as a trade secret.  *See Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1110 (D.C. Cir. 2011).

So the question is whether Plaintiffs allege reasonable measures to ensure that Ingle and others with access would maintain the secrecy of the business information they seek to protect as a trade secret.  *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 53 (1st Cir. 2007) ("The fact that [plaintiff] kept its work for [defendant] private from the world is not sufficient; discretion is a normal feature of a business relationship.  Instead, there must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made.").  They have not.

The Amended Complaint identifies no measure taken by Plaintiffs to prevent Ingle or any other close business partner or employee from further disclosing the information once it is shared with them.  That Adler maintains his business information "in a confidential manner" is not enough.  Am. Compl. ¶ 20.  Such "discretion is a normal feature of a business relationship." *Incase*, 488 F.3d 46 at 53.  Since Ingle was not barred from sharing the information with Mr. Loyd or others, Plaintiffs have not alleged reasonable measures to establish a trade secret under the DTSA.  *See Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (affirming district court conclusion that there were no reasonable measures under the DTSA or Nebraska trade secret statute where information was shared with "third-party contractor without a confidentiality agreement and without other policies or practices for safeguarding secrets").

No matter the sophistication of the lock, a bank vault is useless if bankers freely distribute keys to robbers.  And Plaintiffs' business information is not a trade secret if they share it with others who do not have to maintain its secrecy.  The DTSA claim will be dismissed.

**C.**

No federal claim remains.  So the Court now must decide whether to exercise supplemental jurisdiction over Plaintiffs' local law claims.  *See* Am. Compl. ¶¶ 97–136.  This decision is "left to the sound discretion of the district court."  *Edmonson & Gallagher*, 48 F.3d at 1265–66.  A court may decline supplemental jurisdiction in some circumstances, including if it "has dismissed all claims over which it has original jurisdiction."  *See* 28 U.S.C. § 1367(c)(3).

The Court no longer has original jurisdiction here.  Plaintiffs relied on the federal question statute, 28 U.S.C. § 1331, to establish jurisdiction.  *See* Am. Compl. ¶ 10.  But that no longer applies because both federal claims will be dismissed.  Diversity jurisdiction also is unavailable.  Charity Brands and Big Circle are both citizens of Delaware, their state of incorporation.  *See id*. ¶¶ 3, 8; 28 U.S.C. § 1332(c)(1).

Thus, the Court chooses to decline supplemental jurisdiction over the remaining local law claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").  Not only does this case now lack federal claims, but evaluation of the local DTSA provision, D.C. Code § 36-401, will raise "complex issue[s] of State law" best left to local courts to adjudicate.  *See* 28 U.S.C. § 1367(c)(1); *accord Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 87 (D.D.C. 2019) ("*Ambellu I*").

To be sure, the allegations in the Amended Complaint are troubling and may even rise to the level of criminal conduct.  They do not, however, make out the federal claims raised in the Amended Complaint that would give this Court original jurisdiction.

## IV.

A giant wooden horse was enough to get the Greek soldiers through the gates of Troy. But the alleged Trojan horse here is not enough for Plaintiffs' claims to remain in this Court. Plaintiffs fail to establish personal jurisdiction over some Defendants and state no federal claim against those that remain.  For these reasons, Defendants' motions to dismiss will be granted and the Amended Complaint will be dismissed without prejudice.  A separate Order will issue.


Dated:  October 14, 2020                              TREVOR N. McFADDEN, U.S.D.J.